**McMANIMON, SCOTLAND
 & BAUMANN, LLC**
75 Livingston Avenue
Roseland, New Jersey 07068
(973) 622-1800
-and-
80 Pine Street, 10th Floor
New York, New York 10005
Richard D. Trenk (admitted *pro hac vice*)
Robert S. Roglieri (admitted *pro hac vice*)

*Attorneys for Plaintiff, City of Atlantic City*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 7 |
| W. WESLEY DRUMMON, | Case No. 19-10670-JLG |
| Debtor. | |
| THE CITY OF ATLANTIC CITY, | Adv. Pro. No. 19-_____-JLG |
| Plaintiff, | |
| v. | |
| W. WESLEY DRUMMON, | |
| Defendant. | |

**ADVERSARY COMPLAINT OBJECTING TO DISCHARGE
PURSUANT TO 11 U.S.C. §727 AND DICHARGABILITY OF
DEBTS PURSUANT TO 11 U.S.C. §523**

Plaintiff the City of Atlantic City (the "City"), by and through its undersigned counsel, McManimon, Scotland & Baumann, LLC, and by way of Complaint against W. Wesley Drummon (the "Debtor"), hereby alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

3. Venue is properly fixed in this Court pursuant to 28 U.S.C. § 1409.

## THE PARTIES

4. The City is a municipal corporation formed under the laws of the State of New Jersey, with its city hall located at 1301 Bachrach Boulevard, Atlantic City, New Jersey.

5. The Debtor is an individual who resides at 1330 1st Avenue, Apt. 621, New York, NY 10021. The Debtor owns and controls Zemurray Street Capital, LLC ("Zemurray") as a member, through his controlling stake in a holding company named Taipan Holdings, LLC, which holds 50% interest in Zemurray ("Taipan").

## FACTS RELEVANT TO ALL COUNTS

**The Debtor Proposes the Lending Program to the City**

6. In July 2012, the Debtor and the City began discussions regarding the implementation of a lending program (the "Lending Program") for the City, through services provided by the Debtor's company, Zemurray.

7. On or about August 28, 2012, the Debtor submitted an initial program proposal for the Lending Program to the City.

8. The Lending Program was presented by the Debtor as a way to (i) assist the City's small business owners in establishing and expanding businesses in the City by providing capital and offering financing; and (ii) assist residents of the City to purchase and rehabilitate homes

2

located in the City by offering residential loan origination services, refinancing programs, and mortgage assistance to those in need.

9. On December 13, 2012, the Debtor sent an email to the City attaching an "Investment Proposal" regarding the Lending Program.

10. The Debtor's proposal sought $3 million in City funds to invest in a loan fund (the "Loan Fund"), which the Debtor asserted would: (i) grow and provide the funding for the loans under the Lending Program; (ii) be used to create "sub-advisor" relationships in furtherance of the Lending Program; and (iii) enable Zemurray to contract with TN BIDCO to provide the lending for the Lending Program.

11. The proposal represented that Zemurray would "underwrite and fund FORTY-MILLION DOLLARS ($40 million) in SBA and mortgage loans . . . [b]ecause principal and interest on these SBA loans and mortgage loans are fully guaranteed by the full faith and credit of the U.S. government, their value fully protects the $3 million investment . . . ."

12. The proposal represented that "[b]ased on conservative projected income, [Zemurray] firmly believes that it will return the $3 million investment to the City of Atlantic City within six months of funding."

13. Over the next several months, the terms and specifics of the Lending Program and related Loan Fund were discussed and negotiated between the Debtor and the City's counsel, Michael Bonner, Esq. ("Bonner").

14. During this time, Zemurray represented to the City that TN BIDCO would administer the Lending Program, and would provide the loan origination and services necessary under the program.

3

15. On April 29, 2013, the Debtor was informed that the City's initial payment into the Loan Fund would be $3 million, with $1.5 million to be used for residential loans and $1.5 million to be used for commercial loans.

16. By June 2013, drafts of a Memorandum of Understanding, between Zemurray and the City, were being circulated to memorialize the terms of the Lending Program.

**Zemurray's Simultaneous Negotiations to Purchase TN BIDCO**

17. In June 2012, one month before proposing the Lending Program to the City, the Debtor began negotiating with TN BIDCO's former Chief Executive Officer, Jim Thigpen ("Mr. Thigpen"), and then-counsel for TN BIDCO shareholders, Chuck Fisher, Esq. ("Mr. Fisher"), for Zemurray's purchase of all the outstanding stock of TN BIDCO.

18. On or about January 28, 2013, the Debtor submitted a Change of Control Application ("Application") to the Tennessee Department of Financial Institutions (the "TNDFI") for regulatory approval of Zemurray's proposed purchase of TN BIDCO.

19. On February 28, 2013, the TNDFI sent a letter to the Debtor seeking clarification on information presented in Zemurray's Application. Specifically, the TNDFI inquired regarding the "source of funds for the purchase price of the BIDCO." Additionally, the TNDFI stated that "[a]ccording to the new business plan, the BIDCO intends to originate residential real estate loans and consumer loans. This does not appear to be a permissible activity for a Tennessee BIDCO."

20. On April 5, 2013, the Debtor responded to the TNDFI's February 28th letter. the Debtor stated that the source of funds to purchase TN BIDCO would be, "[e]quity capital from the members of Zemurray Street Capital LLC." Further, the Debtor stated that he had amended the business plan to "remove any reference to residential mortgage and consumer loan origination."

4

21. On April 18, 2013, the TNDFI sent a letter to the Debtor inquiring again regarding the source of cash funds to pay the TN BIDCO shareholders. Additionally, the TNDFI again advised that TN BIDCO is "prohibited from engaging in any residential mortgage origination activity." Further, the TNDFI requested "current financial information on Zemurray" and "names of the executive/senior officers and directors of Zemurray."

22. On April 24, 2013, the Debtor responded to the TNDFI's April 18th letter and represented that "[t]he source of capital used by Zemurray for the payment to existing shareholders is the proceeds from preferred units issued to members of the LLC." Further, the Debtor stated that TN BIDCO will not originate residential mortgages and "has no present plans to service residential mortgage loans where any direct contact with the consumer is anticipated."

23. On June 4, 2013 and July 22, 2013, the Debtor provided the TNDFI with financial information and a list of Zemurray's members, which included Lantana Family Trust and Taipan Holdings. The documents represented that Lax is the Trustee and a member of Lantana Family Trust and the Debtor is a member of Taipan Holdings, LLC.

24. On August 2, 2013, the Debtor sent an e-mail to the TNDFI, reducing the capitalization from $5 million to $3 million.

**The City and Zemurray Execute a Memorandum of Understanding**

25. On May 22, 2013, the City Council adopted Resolution No. 450 authorizing execution of a Memorandum of Understanding between Zemurray and the City (the "Contract").

26. On May 31, 2013, the City executed the Contract with Zemurray, which memorialized the City's agreement with Zemurray to create the Loan Fund, which was to be used in connection with the Lending Program.

5

27. The Contract was signed by City Clerk Rhonda Williams and Mayor Langford on behalf of the City, and by the Debtor on behalf of Zemurray.

28. As set forth in the Contract, the purpose of the Loan Fund was as follows:

> The City desires to establish a loan fund (the "Loan Fund") in which the monies will be used to assist: (a) small business owners in obtaining financing that will promote business growth and job creation in the City, (b) individuals in obtaining affordable mortgages and/or refinancing or modifying their existing mortgages on properties located in the City, and (c) individuals with rehabilitation and development of other housing stock in the City.

29. The term of the Loan Fund was five (5) years, beginning May 31, 2013.

30. The Contract required that during the five-year period of the Loan Fund, Zemurray would provide the Mayor's office "within forty-five (45) calendar days after the end of each calendar quarter with a report setting for [sic] the use of the monies in the Loan Fund for the lending purposes set forth in this MOU[Contract]."

31. The Contract stated that upon the execution of an escrow agreement, the City would "place up to five million dollars ($5,000,000) in cash into the escrow account, with the initial amount being no less than three million dollars ($3,000,000)."

32. The Contract stated that the monies held in the escrow account, "will be used to establish the Loan Fund and shall be released from escrow only pursuant to the terms of the escrow agreement."

33. The Contract required that if the Loan Fund was not fully funded by the City, i.e. with the maximum $5,000,000, within six (6) months of its establishment, then Zemurray was to "reduce its estimates for aggregate lending under the Loan Fund and provide such estimates to the Mayor's Office within thirty (30) calendar days after such six (6) month period."

6

34. The Contract specified that Zemurray would "oversee implementation of the Loan Fund and will use [TN BIDCO] to lend the monies in the Loan Fund."

35. The Contract expressly stated that TN BIDCO had the lending expertise to carry out the purposes of the Contract and that it was designated as a preferred lender by the Small Business Administration ("SBA").

36. The Contract required that at the conclusion of the Loan Fund, Zemurray "will ensure that the City's monies used to establish the Loan Fund are returned to the City within thirty (30) calendar days."

37. In conjunction with execution of the Contract and based on the representations made by Zemurray, the City applied for approval of the Lending Program with the New Jersey State Department of Community Affairs, Division of Local Government Services ("NJDCA").

38. On June 18, 2013, the NJDCA granted partial approval of the Lending Program. As part of the City's Application for approval to the NJDCA, the City submitted materials that contained Zemurray's representations regarding its relationship with TN BIDCO and its ability to provide services for the Lending Program as set forth in the Contract.

**The City Wires $3 Million to the Escrow Account for the Establishment of the Loan Fund**

39. On July 11, 2013, the City Council adopted Ordinance No. 35 that authorized the establishment of $3 million for the creation of the Loan Fund.

40. On July 19, 2013, the City and Zemurray executed an escrow agreement ("Escrow Agreement"), pursuant to which the City would deposit $3 million with City National Bank, in conformance with the terms of the Contract (the "Escrow Account").

7

4852-0938-9463, v. 1

41. The Escrow Agreement was signed by the Debtor on behalf of Zemurray, Ronald Cash and Mayor Langford on behalf of the City and Patricia Nelson on behalf of City National Bank.

42. The Escrow Agreement permitted instructions to be given to City National Bank regarding the Escrow Account only upon the direction of authorized signatories on the account listed in Schedule A attached to the Escrow Agreement: for the City, Mayor Lorenzo Langford and City Business Administrator Ronald Cash were authorized signatories, and for Zemurray, the Debtor was an authorized signatory.

43. On August 8, 2013, the City wired $3 million from its account at Sun National Bank to the Escrow Account.

44. The wire instructions stated the following with respect to the $3 million that was being deposited in the Escrow Account: "City National Bank of New Jersey Zemurray Street Capital LLC, Escrow Acct. FBO [For the Benefit Of] City of Atlantic City."

45. Further, the wire instructions stated: "[P]ayment to establish Mayor's Loan Pool Program".

**Zemurray Wires $3 Million Out of the Escrow Account and Into TN BIDCO's Bank Account**

46. On August 23, 2013, fifteen (15) days after the City wired the $3 million into the Escrow Account, the Debtor, on behalf of Zemurray, wired the entire $3 million from the Escrow Account to TN BIDCO's account at First Bank in Lexington, Kentucky.

47. Neither the Mayor nor Business Administrator ever gave authorization for the funds to be withdrawn from the Escrow Account.

48. Neither Zemurray nor the Debtor ever advised the City that the $3 million was being transferred from the Escrow Account.

8

49. According to an email dated August 12, 2013, Mr. Thigpen informed Mr. Fisher that the Debtor advised that the funds to acquire TN BIDCO would be wired to TN BIDCO's account and, once received, TN BIDCO would then wire the funds to the attorney trust account of Grant, Konvalinka, and Harris, the law firm representing the TN BIDCO shareholders. Further, Mr. Thigpen advised that the money should be held in escrow to pay out each of the TN BIDCO shareholders.

50. TN BIDCO's closing statement (the "Closing Statement"), dated August 23, 2013, delineates how most of the City's $3 million was disbursed. According to the Closing Statement, $1,535,323 was paid to the shareholders to purchase all outstanding stock and $692,363.77 was used to partially pay off a line of credit allegedly due to Citizens Tri-County Bank. This totals $2,227,686.77.

51. On August 23, 2013 TN BIDCO wired $2,227,686.77 to its law firm, Grant, Konvalinka, and Harris, in order to pay the shareholders and the outstanding line of credit.

52. Also on August 23, 2013, TN BIDCO wired $20,000 to the Debtor.

53. Also on August 23, 2013, TN BIDCO wired $5,000 to its law firm, Grant, Konvalinka and Harris. This represents the legal fee owed for assisting in Zemurray's stock purchase of TN BIDCO.

54. On August 30, 2013, TN BIDCO's checking account reflects a withdrawal in the amount of $600,000 (Check #10843). This corresponds with a $600,000 deposit shown in the account of Farmers & Merchants Bank.

55. Thus, a total documented amount of $2,852,686.77 was disbursed by TN BIDCO from the $3 million received from Zemurray; leaving $147,313.30 unaccounted for. The following chart demonstrates the disbursements referenced above:

9

| Date | Event |
|---|---|
| August 8, 2013 | The City wired $3 million from the City's account at Sun National Bank to Escrow Account |
| August 23, 2013 | The Debtor wires $3 million from the Escrow Account to TN BIDCO |
| August 23, 2013 | TN BIDCO wires $2,227,686.77 to Grant, Konvolinka, Harrison, P.C<br>• $1,535,323.00 was paid to TN BIDCO's shareholders<br>• $692,363.77 was paid to Citizens Tri-County Bank for partial payoff of line of credit |
| August 23, 2013 | TN BIDCO wires $20,000 to the Debtor |
| August 23, 2013 | TN BIDCO wires $5,000 to Grant, Konvolinka, Harrison, P.C representing a legal fee for assisting in Zemurray's purchase of TN BIDCO |
| August 30, 2013 | TN BIDCO withdraws $600,000 (Check #10843). This corresponds with a $600,000 deposit shown in the account of Farmers & Merchant Bank |

56. The City never agreed that any part of the Loan Fund could be used to acquire TN BIDCO. No such representation, request or agreement was ever made by Debtor or anyone on his behalf.

57. On November 21, 2013, Lax, as Trustee of Lantana Family Trust, and the Debtor, as managing member of Taipan, signed a Consent to Authorization which stated in pertinent part:

> The undersigned, being all of the Members of Zemurray Street Capital, LLC (the "Company"), a Delaware limited liability Company, do hereby unanimously agree and certify that: W. Wesley Drummon, the Manager of the Company, pursuant to the Company's Operating Agreement, is authorized and empowered to act, negotiate, enter into and execute, in the name and on behalf of the Company, any agreements, documents, instruments, certificates, and other commitments and obligations that he deems or believes to be advisable and in the best interest of the Company.

58. On May 29, 2014, the TNDFI wrote to Zemurray concerning its application for the acquisition of control of TN BIDCO.

10

59. In its letter, the TNDFI advised that Zemurray failed to inject $3 million of capital into TN BIDCO, but rather used part of the $3 million to "buyout the existing TN BIDCO shareholders."

60. The TNDFI stated:

> Due to the failure of Zemurray to inject the required capital, the proposed business plan (as submitted with the June 28, 2013 application and any subsequent revision) has **not been approved** by the Department for use or implementation by TN BIDCO. TN BIDCO is **not authorized** to conduct any new activity or expansion of products and services as outlined in the proposed business plan…"

**The City's Demand for the Return of the $3 Million**

61. Although the Debtor represented that Zemurray would "use" TN BIDCO to carry out the Lending Program, neither the Debtor or Zemurray had the ability and authority to bind TN BIDCO to participate on May 31, 2013.

62. On May 31, 2013, Zemurray did not own or control TN BIDCO, and no one at TN BIDCO was ever made aware of Zemurray's negotiations with the City or the Lending Program.

63. Additionally, TN BIDCO was not authorized to engage in any residential mortgage origination or servicing activity.

64. Thus, Debtor's representations made to the City regarding TN BIDCO's ability to carry out a residential program as party of the Lending Program for the City's residents were materially false.

65. From the time the Contract was executed until October 27, 2014, TN BIDCO never made any loans under the Lending Program or provided any financial or loan assistance to any residents or business owners in the City.

4852-0938-9463, v. 1

**The City's Demand for the Return of the $3 Million**

66.     At the end of the third quarter of 2013, Michael P. Stinson, Director of Revenue & Finance/Chief Financial Officer for the City, reached out to City National Bank to obtain a bank statement regarding the $3 million.

67.     City National Bank responded and indicated that the $3 million was **no** longer in the Escrow Account.

68.     This is the first time the City became aware that the $3 million was no longer in the Escrow Account.

69.     Immediately thereafter, the City attempted to locate the funds, but was unable to do so.

70.     On March 19, 2014, Michael J. Perugini ("Perugini"), Deputy Solicitor for the City, called the Debtor and requested information and back up regarding the Loan Fund.

71.     On March 19, 2014, Perugini e-mailed the Debtor memorializing his conversation with the Debtor regarding the City's concerns surrounding the $3 million and demanded an accounting of the funds and requested that the funds "remain intact and frozen until which time the City is satisfied that the funds are secure and being used for the purposes set forth in the MOU."

72.     On March 20, 2014, the Debtor confirmed receipt of Perugini's March 19, 2014 e-mail and stated that he would speak to Zemurray about the City's concerns.

73.     On March 20, 2014, Perugini also sent a certified letter to the Debtor again requesting information about the City's funds and requested proof that the funds were secured.

74.     On March 26, 2014, the Debtor e-mailed Perugini stating that the Debtor had requested that the bank send the City its funds.

12

75. On March 27, 2014, Perugini e-mailed the Debtor requesting that he call him to discuss the status of the funds.

76. On March 28, 2014, Perugini e-mailed the Debtor and advised him that the City would not tolerate his inability to return phone calls or answer letters.

77. On the same day, Perugini spoke with the Debtor who stated that he would allow the City to opt out of the program and that he would begin to process the return of the City's funds.

78. On April 2, 2014, Perugini had a phone conference with the Debtor regarding his failure to return the City's funds.

79. On April 3, 2014, Perugini received an e-mail from the Debtor indicating that Zemurray was restructuring its balance sheet to return the City's funds as "expeditiously as possible."

80. On the same day, Perugini e-mailed the Debtor confirming his representation that "Zemurray will immediately take whatever steps necessary to place the City's total fund amount of $3,000,000 into a separate account for the return to the City and for the cancellation of the loan program". The e-mail further confirmed that the City and Zemurray would execute an agreement memorializing the parties' intentions to disband the program and for Zemurray to return the funds. Lastly, the e-mail confirmed that the Debtor would send the City a bank statement evidencing the placement of the City funds into a separate account.

81. Later that day, Perugini received an e-mail from the Debtor confirming that Zemurray will execute an agreement with the City to disband the program and for Zemurray to return the City's funds and that Zemurray "will fully work with [the City] so we both can avoid the cost of litigation."

82. On April 7, 2014, Perugini sent an e-mail and certified letter to the Debtor advising him that he has not taken any action to return the City's money and demanding confirmation that the City's funds were placed in a separate account.

83. Thereafter, from April 7, 2014 through May 28, 2014, Perugini left a series of voice messages for the Debtor at his office and on his cell phone and never received a response.

84. On May 7, 2014, the City Council adopted Resolution No. 435 authorizing cancellation of the Contract and demanding the return of funds to the City.

85. On May 21, 2014, Perugini sent a certified letter to the Debtor advising him that the City will begin taking legal action to protect its interest in the Loan Fund.

86. Between the execution of the Contract on May 31, 2013 and March 24, 2014, Zemurray did not provide any quarterly status reports to the City.

87. The only report which was provided to the City was the two-page Status Report that was received on March 24, 2014.

88. To date, the Status Report remains unsubstantiated, even though the City has repeatedly requested documentation to support it.

89. Additionally, the Loan Fund was not fully funded within six (6) months and Zemurray never provided estimates to the City reducing its estimates for aggregate lending under the Loan Fund.

90. Neither the Debtor nor anyone on his behalf ever assisted any small business owners in obtaining financing.

91. Neither the Debtor nor anyone on his behalf ever assisted individuals in obtaining affordable mortgages and/or refinancing or modifying their existing mortgages on properties located in the City.

92.  Neither the Debtor nor anyone on his behalf ever assisted individuals with rehabilitation and development of other housing stock in the City.

93.  Neither the Debtor nor anyone on his behalf ever complied with the City's request to return the $3 million.

**The City Files Suit**

94.  On or about July 15, 2014, the City filed the instant Complaint in the Superior Court of New Jersey.

95.  On or about August 19, 2014, the matter was removed to this Court.

96.  On April 7, 2016 at his deposition, the Debtor testified that at the time of the deposition (i) he had 50% ownership of Zemurray through his ownership of Defendant Taipan Holdings, LLC and (ii) that Lax had 50% ownership of Zemurray through his ownership of Defendant Lantana Family Trust.

97.  Further, the Debtor testified that at the time the Contract was signed (i) he had 50% ownership of Zemurray through his ownership of Defendant Taipan Holdings, LLC and (ii) that Lax had 50% ownership of Zemurray through his ownership of Defendant Lantana Family Trust.

98.  In addition, the Debtor testified that Zemurray was attempting to purchase TN BIDCO prior to executing the Contract with the City.

99.  Additionally, the Debtor testified that he used the City's $3 million to purchase TN BIDCO, as follows:

> Q: Zemurray purchased TN BIDCO?
> A: Yes.
> Q: What did it pay TN BIDCO for the purchase?
> A: $1.3 million I believe.
> Q. Where did that come from?
> A. I believe –
> Q: So the money that Atlantic City gave you, you used to purchase TN BIDCO?

      A: Yes.

100. Thereafter, the Debtor invoked his Fifth Amendment privilege to each question in his deposition.

101. The Debtor also invoked his Fifth Amendment privilege in his responses to the Requests for Admissions served by the City.

102. The Debtor's answers to his interrogatories confirm the transfer of Atlantic City's $3 million to TN BIDCO.

103. Further, the Debtor's answer to his interrogatories confirm that Zemurray acquired 100% of the stock of TN BIDCO.

**The City's Summary Judgment Motion**

104. On April 3, 2017, the City filed a motion for summary judgment against the Defendants, including the Debtor.

105. On December 29, 2017, the District Court entered an Order and Opinion.

106. As set forth in the Court's Order and Opinion, the City's motion for summary judgment was granted as to its breach of contract claim against defendant Zemurray.

107. The balance of the City's motion for summary judgment was denied.

108. Due to the Debtor's pending bankruptcy, the District Court Action was stayed against the Debtor.

109. On March 7, 2015, the Honorable Robert B. Kugler, U.S.D.J. entered a *Consent Judgment Against Defendant Zemurray Street Capital, LLC Only in Favor of Plaintiff the City of Atlantic City* (the "Consent Judgment"). The Consent Judgment is in the amount of $3,000,000.

## COUNT ONE
## (11 U.S.C. § 523(a)(2))

110. The City repeats and realleges the allegations set forth above as if set forth at length herein.

111. The Debtor engaged in a broad, multi-faceted scheme to defraud the City through the following material acts:

- Represented to the City that he had the requisite experience and expertise to implement and oversee administration of the Loan Program.

- Represented to the City that TNBIDCO would be a SBA-certified lender for the Loan Program, despite knowing that TN BIDCO was not approved to make residential loans.

- Represented to the City that loan origination functions under the MOU would be completed by TN BIDCO.

- Represented to the City that Escrow Fund would not be distributed without express authorization of the City which was violated.

- Represented to the City several times in writing that the loan funds would be returned shortly, were liquid and set aside for the City.

- Represented to the City that the money for the Loan Program would be accounted for in quarterly reports.

112. By virtue of these acts, the Debtor obtained money, from the City by false pretenses, false representations and/or actual fraud, or by use of a statement in writing that is materially false, and that Debtor caused to be made or published with intent to deceive.

113. Accordingly, the debts owed by the Debtor to the City are nondischargeable under 11 U.S.C. § 523(a)(2).

**WHEREFORE**, the City demands judgment against the Debtor as follows: (i) determining that all debts owed by the Debtor to the City are nondischargeable; (ii) awarding the City attorneys' fees and costs incurred in this action; and (iii) granting the City such other and further relief as this Court deems just and equitable.

## COUNT TWO
### (11 U.S.C. § 523(a)(4))

114. The City repeats and realleges the allegations set forth above as if set forth at length herein.

115. The Debtor engaged in a broad, multi-faceted scheme to defraud the City.

116. By virtue of these acts, Debtor obtained money, from the City by fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.

117. Accordingly, the debts owed by Debtor to the City are nondischargeable under 11 U.S.C. § 523(a)(4).

**WHEREFORE**, the City demands judgment against Debtor as follows: (i) determining that all debts owed by Debtor to the City are nondischargeable; (ii) awarding the City attorneys' fees and costs incurred in this action; and (iii) granting the City such other and further relief as this Court deems just and equitable.

## COUNT THREE
### (11 U.S.C. § 523(a)(6))

118. The City repeats and realleges the allegations set forth above as if set forth at length herein.

119. Debtor's acts, conduct and representations were materially false and misleading.

120. Debtor's acts, conduct and representations were willful and malicious.

121. Debtor's acts, conduct and representations damaged the City.

122. Accordingly, the debts owed to the city are nondischargeable under 11 U.S.C. § 523(a)(6).

**WHEREFORE**, the City demands judgment against Debtor as follows: (i) determining that all debts owed by Debtor to the City are nondischargeable; (ii) awarding the City attorneys'

fees and costs incurred in this action; and (iii) granting the City such other and further relief as this Court deems just and equitable.

## COUNT FOUR
## (11 U.S.C. § 727(a)(4)(A))

123. The City repeats and realleges the allegations set forth above as if set forth at length herein.

124. Pursuant to 11 U.S.C. §727(a)(4) a debtor may be denied a discharge if he/she knowingly and fraudulently, in or connection with the case –

 a. made a false oath or account;
 b. presented or used a false claim;
 c. gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting for forbearing to act; or
 d. withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

125. In the instant case, the Debtor made a false oath and failed to properly disclose his assets, income and transfers to insiders in engaging in the acts noted above and in failing to disclose substantial interests and assets of the estate, the Debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account.

126. Specifically, the Debtor failed to list his ownership interest in Taipan.

127. As a result, the Debtor should be denied a discharge pursuant to section 727(a)(4)(A) of the Bankruptcy Code.

**WHEREFORE**, the City demands judgment against the Debtor as follows: (i) determining that Debtor is not entitled to a discharge pursuant to section 727(a)(4)(A) of the Bankruptcy Code; (ii) awarding the City attorneys' fees and costs incurred in this action; and (iii) granting the City such other and further relief as this Court deems just and equitable.

## COUNT FIVE
## (11 U.S.C. § 727(a)(4)(B))

128. The City repeats and realleges the allegations set forth above as if set forth at length herein.

129. In engaging in the acts noted above and in failing to disclose substantial interests and assets of the estate, the Debtor knowingly and fraudulently, in or in connection with the case, presented or used a false claim.

130. As a result, the Debtor should be denied a discharge pursuant to section 727(a)(4)(B) of the Bankruptcy Code.

**WHEREFORE**, the City demand judgment against the Debtor as follows: (i) determining that Debtor is not entitled to a discharge pursuant to section 727(a)(4)(B) of the Bankruptcy Code; (ii) awarding the City attorneys' fees and costs incurred in this action; and (iii) granting the City such other and further relief as this Court deems just and equitable.

> **McMANIMON, SCOTLAND**
> **& BAUMANN, LLC**
> *Attorneys for Plaintiff,*
> *The City of Atlantic City*

DATED: June 3, 2019          By:   */s/ Richard D. Trenk*
                                    RICHARD D. TRENK